*E-Filed 2/11/11*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br>　v.<br><br>JODY FONTENOT,<br><br>　　　　Defendant.<br>_____/ | No. CR 10-0778 RS<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |

## I. INTRODUCTION

Jody Fontenot moves to suppress physical evidence seized and statements made subsequent to what he characterizes as an illegal seizure. The United States insists, in contrast, that the officer's investigatory pat down was supported by a reasonable suspicion of criminal activity and that the manner in which the stop and frisk was performed was commensurate with concerns for officer safety. An evidentiary hearing was held on January 25, 2011. For the reasons explained below, Fontenot's motion must be denied.

## II. FACTUAL BACKGROUND

A federal grand jury has returned a single-count indictment against Fontenot; he is charged as a felon in possession of a weapon, in violation of 18 U.S.C. § 922(g)(1). In the late afternoon of September 17, 2010, the San Francisco Police Department's 911 operator received an emergency call. The caller complained of a "threatening" "couple of guys" hanging out in front of a liquor

store at the corner of Geneva Avenue and Santos Street.  That corner is located in the Sunnydale neighborhood of San Francisco.[1]  Several seconds into the call, the caller declared, "oh my God," followed by, "they're pulling out a gun, man, can you please send the cops?"  The line then went dead.  The caller did not identify himself, nor did he include further detail as to what the "couple of guys" looked like.  The operator redialed, but reached only the caller's voicemail.  She then alerted officers by radio of an emergency gun call at that particular location.  The officers were not told by the operator, nor was it included in the CAD report, that the suspect was a male or part of a group.

The corner of Geneva Avenue and Santos Streets hosts two liquor stores: the M&M Short Stop Market and the E-Z Stop Market.  SFPD officers responded primarily to the M&M market, as the E-Z Stop apparently falls within the territory of the Daly City Police Department.  Officers Robert Toomey and Christina Johnson were among the first to arrive (roughly three minutes after the 911 call), and they focused on M&M Short Stop.  When the officers arrived, there were several cars parked in a lot at the store's front (the lot sits between the store's entrance and Geneva Avenue) and several individuals within the market.  Johnson testified that she recognized an individual, Troy McDonald, sitting inside a car parked in the M&M lot.  She separated from Toomey to speak with McDonald.  Based on their brief conversation, Johnson testified that she had no reason to suspect his involvement.  She did not detain him further.

Meanwhile, Officer Toomey peered into the market.  He maintains that he recognized the individuals inside as either employees or a delivery person.  Toomey claims he did not see any customers.  He testified, moreover, that the *only* people he saw outside and in front of the market were three men collected as a group.  Fontentot was one of them, and was at that time standing next to a Cadillac parked in the market's lot.  The other two men were seated inside the vehicle.  Fontenot's friend and witness, Lonnie Phillips, testified that he was standing roughly between the market's front and a Doritos delivery truck.  He estimated that actually six to seven customers were

---

[1] According to the officers' testimony, the M&M market is located in a particularly rough, crime-ridden patch of Sunnydale.  As Officer Toomey explained, "[Sunnydale is] a high crime area known for robberies, gang activity, crimes which include narcotic sales, homicides.  You name it, it pretty much has it."

inside the market and that fifteen to twenty people were coming and going through the immediate area, some of whom were collected at two bus stops near the store's front. The three law enforcement officers who testified denied seeing anyone standing at either stop or generally milling about when the officers arrived.

Toomey moved toward the parking lot and approached Fontentot's group with his rifle drawn. At the hearing, Toomey recalled that he held the gun lowered towards the ground, in a "low ready" position. As Toomey approached, he told the three men to show their hands. Fontenot says he did as he was told; Toomey suggests Fontenot was the only one of the three who did not comply readily with the order. Toomey testified that Fontenot raised his palms only to mid-chest or, at most, shoulder level and kept his elbows tucked into his sides. At the hearing, the officer expressed his opinion that a refusal to lift one's hands high in the air sometimes indicates contraband or weaponry hidden in the waistband. Toomey repeated his show hands order and raised his rifle; this time, it appears Fontenot essentially acquiesced. Toomey lowered his rifle and explained that he was looking for someone with a gun. Fontenot insisted he was unarmed and, at least according to the defendant, warned Toomey that he was "not on paper." Despite Fontenot's protestations, Toomey performed a pat search. He felt what he described as a hard, solid object near Fontenot's waistband. Fontenot insisted the object was a knife. Suspicious that it was really a handgun, Toomey asked for the assistance of a third officer, Albert Johnson, who recovered a loaded .357 caliber revolver from Fontenot's waistband. Fontenot was then placed under arrest.

### III. DISCUSSION

1. <u>Arrest or Investigatory Stop</u>

Fontenot argues the stop was too intrusive to be considered an investigatory stop, and contends it amounted to a de facto arrest. Accordingly, Fontenot argues Toomey must, but cannot, demonstrate probable cause. The United States does not attempt to satisfy the probable cause requirement; it characterizes the stop as purely investigatory and insists that all Toomey needed to embark on such action was reasonable suspicion of criminal activity. At least under these facts, the United States has honed in on the appropriate inquiry.

"Stops under the Fourth Amendment fall into three categories." *Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993). First, a police officer may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave. *Id.* (*citing Florida v. Bostik*, 501 U.S. 429 (1991)). "Such brief, 'consensual' exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures." *Id.* Next, an officer may "seize" citizens for brief, investigatory stops; this class of stops is not consensual, and must be supported by "reasonable suspicion." *Id.* (*citing Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Naturally, "reasonable suspicion" must exist "at the moment of seizure." *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Finally, police stops may amount to full-scale arrests, and must be supported by probable cause. *Id.* (*citing Adams v. Williams*, 407 U.S. 143, 148-49 (1972)). For purposes of the latter two categories, a person is "seized" only when "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980). In other words, a "seizure" occurs—and the protections of the Fourth Amendment are triggered—only where "in the view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554.[2]

Fontenot contends he was "seized" the moment Toomey approached him with his weapon drawn (whether the rifle's barrel was lowered or not), and ordered him to hold his hands in the air. Even assuming Fontenot did not raise his hands sufficiently high the first time he was told to do so, there is no real question that a reasonable person would have felt free to disregard Toomey completely and "walk away." *Id.* *See also United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003) (finding "show hands" order constituted seizure because a "reasonable person in [the defendant's] situation would not have felt free to ignore the request of the marshals, who likely had their hands on their weapons when they gave the order"). This conclusion is reinforced by the second "show hands" order, where Toomey momentarily raised his rifle.

---

[2] "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554-55 (citations omitted).

The less obvious question is whether the stop and "show hands" command amounted to an arrest. Distinguishing between the two involves a fact-driven review of the "totality of the circumstances." *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990). Courts may consider "both the intrusiveness of the stop (the aggressiveness of the methods used by police and the degree to which the suspect's liberty was restricted) and the justification for using such tactics (whether the officer had sufficient basis to fear for his or her safety warranting a more intrusive action)." *United States v. Rousseau*, 257 F.3d 925, 929 (9th Cir. 2001). As a general rule, "limited intrusions on a suspect's liberty during a *Terry* stop" are permitted "to protect the officer's safety," and "the use of force does not convert the stop into an arrest if it is justified by a concern for the officer's personal safety." *Id*. at 929-30 (*citing United States v. Hensley*, 469 U.S. 221, 235-36 (1985)). Obviously, Toomey's approach was aggressive and intrusive. It was not, however, unreasonably so, if considered in context. Toomey was responding to a call that placed a brandished gun in the hands of someone in front of a liquor store. Although there were other officers in the vicinity, Toomey was by himself when he approached Fontenot and his friends. It was therefore reasonable under the circumstances and in the interest of his safety for Toomey to approach with his weapon drawn and held in a low ready position, and then to order that the three men raise and make visible their hands. When Fontenot did not comply fully, Toomey raised his rifle, but briefly. In short, the circumstances do not amount to de facto arrest. It was an investigatory stop and the operative question becomes whether Toomey had a reasonable suspicion Fontenot and his companions were engaged in criminal activity.[3]

2. Reasonable Suspicion

"Reasonable suspicion requires specific, articulable facts which, together with objective and particularized inferences, form a basis for suspecting that a particular person is engaged in criminal

---

[3] This is not to say, of course, that the sheer possibility that Fontenot had a weapon renders the investigatory stop constitutionally permissible. Toomey's actions *must* still have been backed by a reasonable suspicion that criminal activity was afoot. *See Florida v. J.L.*, 529 U.S. 266, 272-73 (2000) (rejecting "firearm exception" whereby "a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing" as inconsistent with the liberty protections of the Fourth Amendment).

conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (citation omitted). While, as discussed below, Toomey did make a handful of his own observations at the scene, any suspicion that Fontenot—or anyone—was carrying a gun arose primarily from the 911 call. Prior to the approach, Toomey did not see Fontenot brandish the revolver or otherwise behave in a manner at all suggestive of criminal activity. Where it is not an officer's but instead a citizen's observation that supplies the basis for reasonable suspicion, the government must demonstrate how that observation is reliable. *See Florida v. J.L.*, 529 U.S. 266, 274 (2000) (finding that anonymous tip regarding a person with an unlawful gun must be supported by indicia of reliability of the kind contemplated in *Adams v. Williams*, 407 U.S. 143 (1972) and *Alabama v. White*, 496 U.S.325 (1990) to justify stop and frisk).

        The Supreme Court's analysis in *Florida v. J.L.* supplies a helpful starting point. There, officers received a tip from an anonymous caller. The caller warned that a young, black male standing at a particular bus stop and wearing a particular outfit was carrying a gun illegally. 529 U.S. at 268. The call was not recorded or transcribed and the police kept no official record of its existence. The officers arrived at the stop shortly thereafter, and came upon three men. The defendant matched the description provided by the caller. An officer approached the defendant, ordered him to raise his hands and rest them on the bus stop, frisked him, and found a gun in his pocket. Apart from the call, the officer had no reason to suspect any wrongdoing, and the only question before the Court was whether the call was sufficiently reliable to justify the stop. *Id.* at 270-72 (*citing Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *Alabama v. White*, 496 U.S.325 (1990)). It was not. *Id.* "The reasonableness of official suspicion," the Court explained, "must be measured by what the officers knew before they conducted their search." *Id.* at 271. "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.*[4]

---

[4] In so holding, the Court also declined to adopt a "firearm exception" that would give police officers broader license to investigate tips alleging illegal guns than would ordinarily be possible under *Terry*'s reasonable suspicion standard. *Florida v. J.L.*, 529 U.S. at 272. While the Court

In a concurring opinion, Justice Kennedy expanded on what factors might satisfy the reliability requirement. "A tip might be anonymous in some sense," he reasoned, "yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action." *Id.* at 275. An accurate prediction of future conduct, he wrote, classically renders an anonymous tip more reliable. So too might repeated contact with the same caller, or conduct by the caller that places his or her anonymity at risk (such as calling from a traceable telephone line). *Id.* at 276 (noting that, as it is unlawful in many states to make a false police report, a caller who uses a traceable line or whose voice is recorded is more reliable than a truly anonymous one).

In *United States v. Terry-Crespo*, the Ninth Circuit drew upon Justice Kennedy's concurrence to distinguish a 911 call reporting an unlawful firearm from the situation addressed in *Florida v. J.L.*. 356 F.3d 1170 (9th Cir. 2004). In the recorded 911 call there, an individual reported that a man had just threatened him with a .45 caliber handgun. *Id.* at 1172. The caller, although hesitantly, gave his name and a description of the assailant's age, ethnicity and attire. He claimed to have called from the cell phone of another, and refused to provide a number where he could be reached. *Id.* A responding officer spotted a figure matching the description, drew his firearm, pointed it at the suspect and ordered that he show his hands. In the midst of a pat search, a .45 caliber handgun fell from the suspect's waistband. *Id.* at 1173. The Ninth Circuit held that, *Florida v. J.L.* notwithstanding, the call supplied a sufficiently reliable basis for the officer's reasonable suspicion. *Id.* at 1177. Specifically, the Court found the call was not really "anonymous," as the caller narrowed the class of possible informants by relaying his name. Second, the emergency nature of a 911 call, as opposed to a report of general criminal behavior, rendered the information more reliable. *Id.* at 1196. In an emergency, "[p]olice delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and

---

recognized that firearms are dangerous and pose a special threat to officer safety, it insisted that the *Terry* rule responds to this risk by permitting protective searches "on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause . . . ." *Id.* (*citing Terry*, 392 U.S. at 30).

undermine the 911 system's usefulness." *Id.* (weighing "the competing interests of individual security and privacy with the need to promote legitimate governmental interests" and finding it "reasonable to accommodate the public's need for a prompt police response").[5]  Finally, the Court found that the caller jeopardized his anonymity (and exposed himself to legal sanction) because "[m]erely calling 911 and having a recorded telephone conversation risks the possibility that the police could trace the call or identify [the caller] by his voice." *Id.*

At first glance, the facts of this case seem to fall somewhere between the poles of *Florida v. J.L.* and *Terry-Crespo*.  That said, the factors deemed important in *Terry-Crespo* and employed to render the call reliable *there* suggest the same outcome *here*.  As in *Terry-Crespo*, the call here was a recorded, emergency 911 call, where the caller provided a first-hand account of on-going emergency ("oh my god," the caller exclaimed, "they're pulling out a gun, man . . . ."). In *Florida v. J.L.*, in contrast, the caller failed to offer any explanation of how he knew of the gun or why the officers should believe him.  *See Terry-Crespo*, 356 F.3d at 1172.  There is no question here as to *how* the caller came upon his information, and the fact that the experience and reporting happened simultaneously lends further reason for the officers to treat the report seriously.  While the caller did not identify himself verbally, the 911 operator had access to the telephone number (the record indicates, after all, that she redialed the number and left a message) and the name of the account owner.  It is, of course, possible the caller was not the account holder; even so, the caller's identity in this instance is at least as reliable as it was in *Terry-Crespo*, where there was an unverifiable name and a voice recording.  To virtually the same extent as in *Terry-Crespo*, then, the caller in this case subjected himself to recrimination in the event the report proved to be fabricated.[6]

---

[5] On a related note, the Court also suggested that "first hand information from a crime victim laboring under the stress of recent excitement" tends to be more reliable than a stale report, for essentially the same reason an "excited utterance" operates as an exception to the hearsay rule. 356 F.3d at 1177.

[6] The extent to which this possibility operated as a deterrent is undermined, at least somewhat, by the fact that the same caller apparently made a second emergency telephone call complaining that he had been locked into the trunk of a limousine.  Officers responded to the site, found no sign of a body locked in any vehicle, and attributed the report to a prank call.

No. CR 10-0778 RS
Order

Unlike either the tip in *J.L.* or the emergency call in *Terry-Crespo*, however, the 911 caller here provided little information that would identify the culprit physically. In both *J.L.* and *Terry-Crespo*, the potential problem was not how officers were able to pinpoint a particular person, but the basis for suspecting that person had a weapon (or, as *J.L.* put it, a basis for trusting the tip's "assertion of illegality"). Both cases did assume that a tip should also be reliable "in its tendency to identify a determinate person." *Florida v. J.L.*, 526 U.S. at 272. Here, the caller relayed only that a "couple of guys" standing in front of a liquor store on Geneva Avenue and Santos Street were acting in a threatening manner, and that one of them pulled out a gun. As became clear at the hearing, the operator did not explain to the officers that the suspect was a male. Even if the caller reliably indicated that *someone* had a gun, the defendant insists that he never indicated that person was Fontenot.

Toomey testified, however, that when he arrived at the M&M that evening, Fontenot and the two men in the car were the *only* people he saw standing in front of the market, and the *only* non-employees he saw anywhere in the vicinity. From the record, it is also clear that at least two other individuals were close by: Troy McDonald was seated in his vehicle in the parking lot; defense witness Lonnie Phillips was also standing in front of the market but between it and a Doritos delivery truck. Although Phillips testified he was with a handful of other people and insists still others were milling about, no other witness supports these claims. At any rate, no one actually disputes, and the evidence does not contradict, Toomey's claim that he saw only a single group of possible suspects. It would be a different matter if Toomey had singled Fontenot out of a larger gathering.

Moreover, Toomey pinpoints one piece of behavior unique to Fontenot: as Toomey approached and commanded that the three men raise their hands, Toomey insists Fontenot raised his arms in a way that at least looked like he meant to avoid exposing or dislodging a gun from his clothing. Fontenot argues what he did with his hands is irrelevant to the reasonable suspicion inquiry, as he argues the "stop" occurred the instant Toomey approached with his weapon drawn. The two events cannot be so easily parsed. As detailed above, a "stop" occurs where a reasonable

person does not feel free to disregard, or walk away from, the police. Fontenot was certainly not free to leave and was obviously "stopped" in the constitutional sense. But, if the precise moment the "stop" happened really must be pinpointed, it would be *after* the second show hands command, to which Fontenot complied. To the extent Fontenot's initial hand motions were suggestive of hiding or protecting a weapon, they can be considered in the reasonable suspicion inquiry. Because Fontenot and his group were the only individuals Toomey saw standing in front of the market, because it was only Fontenot who behaved strangely, and because Toomey was responding to a reliable, emergency gun report, there was reasonable suspicion that it was Fontenot who had the gun.

## IV. CONCLUSION

For the reasons articulated above, Fontenot's motion must be dismissed. A status conference shall be held on March 1, 2011 at 2:30 p.m.

IT IS SO ORDERED.

Dated: 2/11/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE